**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**INNOVATION LAW LAB,**

      **Plaintiff,**

v.                                                                          Civ. No. _____

**U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT,**

      **Defendant.**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### I. PRELIMINARY STATEMENT

1. On March 18, 2022 the U.S. Department of Homeland Security Office of Inspector General (DHS OIG) publicly issued an exceptional and urgent alert calling on U.S. Immigration and Customs Enforcement (ICE) to immediately remove all individuals in ICE custody from the Torrance County Detention Facility (TCDF) in Estancia, New Mexico, because of the facility's dangerous conditions and severe staffing shortages.

2. ICE refused to abide by the DHS OIG's recommendations and instead disputed the impartiality and accuracy of the DHS OIG's findings. ICE continued to detain people at TCDF and transferred in additional people to TCDF, while failing to adequately address the health and safety issues documented by the DHS OIG, including non-functioning moldy sinks, clogged toilets full of human waste, mold, water leaks, hot water issues, and issues with access to drinking water. The ICE Contracting Officer for TCDF escalated financial penalties for the understaffing of the facility but CoreCivic—the private prison corporation that owns and operates TCDF—remains unable or unwilling to fill numerous vacancies.

1

3. Plaintiff Innovation Law Lab provides pro bono legal services to individuals detained in ICE custody at TCDF and advocates for accountability for ICE's detention practices. Alarmed by ICE's hostility to the DHS OIG inspection team and lack of transparency regarding the dangerous conditions at TCDF, Plaintiff filed a Freedom of Information Act (FOIA) request on May 3, 2022, to shed light on ICE's inadequate response to the DHS OIG's recommendations.

4. This case is about ICE's failure to timely grant or deny Plaintiff's request for expedited processing and the agency's unlawful withholding of non-exempt records responsive to Plaintiff's FOIA request.

## II. JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction over Plaintiff's FOIA claims pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 552(a)(4)(B). Plaintiff's request for declaratory and other relief is properly subject to this Court's subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201(a), and 2202.

6. Venue is proper within this District under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1391(b)(1), (b)(2), and (e)(1).

## III. PARTIES

7. Plaintiff Innovation Law Lab (Law Lab) is a 501(c)(3) non-profit organization based in Portland, Oregon.

8. Law Lab harnesses technology, lawyers, and activists to advance immigrant and refugee justice. Law Lab has vast experience providing pro bono legal services to asylum-seeking immigrants in detention, including establishing pro bono projects in Artesia, New Mexico, and Dilley, Texas, to provide representation for immigrant families in detention. As a

member of the El Paso Immigration Collaborative (EPIC), Law Lab works to win release, provide support, and facilitate legal representation for persons in ICE custody at a number of detention facilities in New Mexico and Texas, including TCDF.

9. An integral part of Law Lab's work is documenting the human rights abuses suffered by individuals detained in ICE custody and advocating for oversight, accountability, and an end to all immigration detention. Law Lab has engaged in extensive research and reporting on these issues at various detention facilities, including by way of a complaint submitted to the DHS Office of Civil Rights and Civil Liberties in 2021 regarding the mistreatment of Haitians at TCDF and a recent publication regarding systemic abuses of individuals detained in ICE custody at another facility in New Mexico, the Otero County Processing Center.

10. Timely, complete, and accurate information about ongoing governmental operations is key to the effectiveness of Law Lab's legal services and advocacy work.

11. Plaintiff has constructively exhausted all non-futile administrative remedies.

12. Defendant ICE is an executive agency component of DHS and an "agency" within the meaning of 5 U.S.C. § 552(f)(1).

## IV.  FACTS

13. ICE entered into an Intergovernmental Service Agreement (IGSA) with Torrance County in 2019 under which Torrance County would detain civil immigration detainees.

14. Torrance County entered into an agreement with CoreCivic in 2019 to detain civil immigration detainees pursuant to the IGSA that Torrance County entered into with ICE at the Torrance County Detention Facility (TCDF) located in Estancia, New Mexico.

15. Law Lab started providing pro bono legal services to individuals in ICE custody at TCDF in August 2019.

16. Law Lab is a partner organization of EPIC—a pro bono legal project aimed at increasing access to legal representation for individuals detained in ICE custody at TCDF as well as the El Paso Service Processing Center, Otero County Processing Center, West Texas Detention Facility, and Cibola County Correctional Center.

17. Since August 2019, Law Lab has been providing legal services to individuals in ICE custody at TCDF including consultations, orientations, intakes, legal representation for release on parole, legal representation for release on bond, and legal representation on the merits of individuals' immigration proceedings before Asylum Officers and Immigration Judges.

18. Law Lab has also engaged regularly in advocacy related to conditions faced by individuals in ICE custody at TCDF including requests for release because of COVID-19 concerns pursuant to *Fraihat v. U.S. Imm. & Customs Enf.*, 445 F. Supp. 3d 709 (C.D. Cal. Apr. 20, 2020), advocacy regarding non-compliance with ICE's Pandemic Response Requirements, advocacy regarding non-compliance with ICE's 2011 Performance-Based National Detention Standards (2011 PBNDS), and a complaint to the DHS Office of Civil Rights and Civil Liberties that Law Lab co-authored in 2021 on behalf of individuals from Haiti detained in ICE custody at TCDF regarding adverse treatment, access to counsel, and due process violations.

*DHS OIG Sounds Alarm on Staffing, Safety, Sanitation Issues*

19. ICE issued a Contract Discrepancy Report in December 2020 regarding staffing shortages at TCDF.

20. Despite multiple corrective action plans aimed at improving facility staffing, TCDF failed to achieve proper staffing.

21. The DHS OIG conducted an unannounced in-person inspection of TCDF from February 1, 2022 through February 3, 2022 to determine whether TCDF was in compliance with the 2011 PBNDS.

22. On March 18, 2022, the DHS OIG publicly issued a management alert regarding TCDF (# OIG-22-31), which recommended the immediate removal of all detainees from TCDF.

23. The DHS OIG management alert was addressed to Tae Johnson, Acting Director of ICE.

24. In the management alert, the DHS OIG stated that it had determined that ICE must take immediate steps to address critical staffing shortages that led to safety risks and unsanitary living conditions at TCDF.

25. In the management alert, the DHS OIG stated that critical understaffing at TCDF has prevented the facility from meeting contractual requirements that are meant to ensure ICE detainees reside in a safe, secure, and humane environment.

26. In the management alert, the DHS OIG documented excessive and avoidable unsanitary conditions, including non-functioning moldy sinks, clogged toilets full of human waste, mold, water leaks, hot water issues, and issues with access to drinking water.

27. In the management alert, the DHS OIG noted that TCDF has an extensive list of backlogged work orders for facility repairs.

28. In the management alert, the DHS OIG recommended that ICE immediately relocate all detainees from TCDF.

29. In the management alert, the DHS OIG also recommended that ICE place no detainees at TCDF unless and until the facility ensures adequate staffing and appropriate living conditions.

*ICE Disputes DHS OIG Inspectors' Findings and Refuses to Depopulate Facility*

30. ICE disputed the DHS OIG management alert, asserting that the DHS OIG falsified or mischaracterized evidence and ignored facts to achieve preconceived conclusions.

31. The DHS OIG disagreed with ICE's concerns, responding that the inspection team provided professional, independent oversight and has documented support for all reported findings.

32. The DHS OIG reiterated its recommendation that detainees should be immediately removed from TCDF.

33. When the DHS OIG management alert regarding TCDF was made public, it attracted significant news coverage, including by the Washington Post, CNN, ABC News, NBC, and Axios, among other media outlets.

34. Members of Congress, including Senator Martin Heinrich, Senator Ben Ray Luján, Representative Melanie Stansbury, and Representative Teresa Leger Fernández, promptly called on ICE to adhere to the DHS OIG recommendation regarding the immediate removal of ICE detainees from TCDF.

35. Representative Bennie G. Thompson, Chair of the House Committee on Homeland Security, and Representative Nanette Diaz Barragán, Chair of the Subcommittee on Border Security, Facilitation, and Operations, urged ICE to immediately remove detainees from TCDF and end the contractual agreement with the facility.

36. Representative Zoe Lofgren, Chair of the House Judiciary subcommittee on immigration, called on ICE to immediately terminate the contract and close TCDF.

37. Law Lab issued a joint press release on the day the DHS OIG management alert was made public, calling for the immediate release of people detained by ICE at TCDF, the

termination of the IGSA for the facility, an independent investigation, and meaningful accountability for ICE officials who oversee TCDF.

38. Contrary to the recommendation set forth in the DHS OIG management alert, ICE did not immediately remove all individuals in ICE custody from TCDF.

*Staffing Issues and Deplorable Conditions Persist*

39. At the time of the DHS OIG unannounced inspection, TCDF was at 54% of the required staffing under the IGSA, with 133 full-time employees and 112 staffing vacancies.

40. On March 1, 2022, ICE issued a Contract Discrepancy Report regarding staffing shortages at TCDF, which asserted that critically short staffing plans are directly responsible for a breakdown in the overall operational capabilities at TCDF.

41. In the March 1, 2022 Contract Discrepancy Report, ICE also asserted that CoreCivic has not been able to demonstrate the ability to provide a safe environment for staff and noncitizens, or to provide the care necessary to ensure proper facility maintenance, overall cleanliness, and personal hygiene needs, resulting in repeated and ongoing violations of the IGSA and the 2011 PBNDS.

42. As of March 4, 2022, TCDF was at approximately 46% of the required staffing under the IGSA.

43. Law Lab continues to provide legal services to individuals in ICE custody at TCDF after the DHS OIG issued its management alert regarding the facility.

44. Law Lab continues to document ongoing issues regarding the conditions in which people in ICE custody at TCDF are held, including issues that Law Lab has repeatedly raised with ICE's El Paso field office that have remained unresolved.

*ICE Transfers More Detainees Into Facility After Contractor's Questionable Inspection*

45. From March 29, 2022 through March 31, 2022, the Nakamoto Group, a private company operating pursuant to a contract with ICE, conducted an inspection of TCDF to assess the facility's compliance with the 2011 PBNDS.

46. Four years prior, in 2018, the DHS OIG—in a review of ICE's policies and procedures for immigration detention inspections—found that the Nakamoto Group's inspection practices are not consistently thorough and that their inspections do not fully examine actual conditions or identify all deficiencies.

47. The Nakamoto Group's report regarding its March 2022 inspection of TCDF stated that the facility met all of the applicable standards.

48. The Nakamoto Group's report regarding its March 2022 inspection of TCDF noted that understaffing at TCDF remained a persistent issue.

49. ICE did not transfer any individuals in ICE custody into TCDF from the time that the DHS OIG management alert was made public until about April 15, 2022.

50. On or about April 15, 2022, ICE resumed transfers of individuals in ICE custody into TCDF.

51. ICE transferred approximately 50 individuals in ICE custody into TCDF on or about April 15, 2022, an additional 30 individuals on or about April 16, 2022, and an additional 31 individuals on or about April 19, 2022.

52. As of April 20, 2022, approximately 137 individuals in ICE custody were detained at TCDF.

53. As of May 17, 2022, approximately 139 individuals in ICE custody were detained at TCDF.

54. As part of its pro bono legal services at TCDF, Law Lab has continued to submit requests for parole to ICE's El Paso field office on behalf of individuals detained in ICE custody at TCDF, many of which have been denied by ICE without a reasoned justification.

*Innovation Law Lab Files FOIA Request*

55. On May 3, 2022, Plaintiff filed a FOIA request to ICE through counsel. Exh. 1.

56. Plaintiff requested expedited processing of its FOIA request with a detailed explanation as to how the request meets the criteria set forth in 6 C.F.R. § 5.5(e)(1). Exh. 1. Plaintiff specified that this request involves: (1) circumstances in which the lack of expedited processing could reasonably be expected to pose an imminent threat to the life or physical safety of individuals in ICE custody at TCDF; (2) an urgency to inform the public about an actual or alleged federal government activity; (3) the loss of substantial due process rights; and (4) a matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence. *Id.*

57. The request sought responsive, non-exempt records regarding the following:

1. *Any and all reports, summaries, memoranda, notes, correspondence, and other records regarding the DHS Office of Inspector General ("OIG") inspection of the Torrance County Detention Facility ("TCDF") that took place from February 1, 2022 through February 3, 2022, including but not limited to: all records regarding the exit briefing that was conducted on or about February 3, 2022 by the DHS OIG inspection team with TCDF and ICE personnel; and any formal response issued by CoreCivic regarding the inspection.*

2. *Any and all correspondence from March 16, 2022 through the date of processing of this request that discusses, describes, references, or otherwise pertains to the March 16, 2022 DHS OIG alert regarding TCDF (# OIG-22-31):*
   a. *Between and within ICE Enforcement and Removal Operations, ICE Office of Professional Responsibility's Office of Detention Oversight, ICE Office of Acquisition Management, ICE Office of the Principal Legal Advisor, ICE Chief of Staff, and the DHS Office of Inspector General;*
   b. *Between any components of ICE and The Nakamoto Group;*
   c. *Between any components of ICE and Torrance County employees, administrators, and/or county commissioners; and*

      d. *Between any components of ICE and CoreCivic employees and/or agents.*

3. *Any and all records regarding the ICE leadership walk-through that took place at TCDF on February 28, 2022.*

4. *Any and all records from July 29, 2021 through the date of processing of this request regarding the following at TCDF:*
   a. *Inoperable and/or malfunctioning sinks, toilets, showers, and faucets in housing units, including but not limited to a lack of hot or cold water;*
   b. *The use of "out of order" tags on cells in housing units;*
   c. *Cell doors failing to unlock automatically or open remotely in housing units;*
   d. *Inoperable and/or malfunctioning call buttons in cells in housing units;*
   e. *The use of plastic bags and/or other items to cover faucets in housing units;*
   f. *Any and all testing of tap water including for hardness;*
   g. *Any and all testing by a state laboratory of samples of drinking and/or wastewater, and any related testing and safety certification(s);*
   h. *The use of coolers containing ice and/or water in housing units, including but not limited to the frequency with which such coolers are cleaned and refilled;*
   i. *All commissary purchases of water and other beverages; and*
   j. *Maintenance issues in the kitchen, including but not limited to inoperable and/or malfunctioning heat, leaky faucets, damage to the floor, and paint on the floor causing individuals to slip and fall.*

5. *Any and all work orders at TCDF for facility maintenance and/or repairs that were drafted, submitted, pending, and/or completed between July 29, 2021 and the date of processing of this request, including but not limited to work orders regarding plumbing issues, faucets, sinks, showers, toilets, vent systems, heating, cooling, and mold.*

6. *Any and all contract discrepancy reports, warnings, corrective action plans, appeals, financial penalties (including deductions and withholdings), white papers, evaluations, tracking tools, contract modifications, and quality assurance surveillance plans, as well as all related correspondence, meeting notes, attachments, and supporting documentation, regarding TCDF from December 1, 2020 through the date of processing of this request, including but not limited to the March 1, 2022 contract discrepancy report and March 1, 2022 contract modification.*

7. *Any and all invoices and supporting documentation for TCDF, as well as invoice payments and documentation of deductions and withholdings for TCDF, from February 1, 2022 through the date of processing of this request.*

8. *Any and all policies, directives, rules, interpretations, post orders, instructions, procedures, and guidance that were created, received, modified, amended, and/or supplemented from February 1, 2022 through the date of processing of this request regarding the operation and/or management of TCDF.*

9. *Any and all reports, summaries, memoranda, notes, correspondence, and other records regarding the ICE OPR Office of Detention Oversight ("ODO") inspection of TCDF that took place from November 16, 2021 through November 18, 2021, including but not limited to all records regarding:*
    a. *Any and all correspondence, meeting notes, and other records regarding the need for, timing of, scope of, and scheduling of this inspection;*
    b. *Any and all documents reviewed pre-inspection by the inspection team;*
    c. *Any and all checklists, interview forms, and other forms and tools used during the inspection;*
    d. *The closeout briefing(s) that were conducted by ODO inspectors with TCDF and local ICE ERO officials regarding preliminary findings;*
    e. *Any and all summaries shared with ICE ERO management officials;*
    f. *Any and all waivers requested and/or granted regarding any detention standards and/or components thereof;*
    g. *Any and all subsequent corrective action plans developed by ICE ERO and/or CoreCivic; and*
    h. *Any and all documentation regarding the implementation of such corrective action plans.*

10. *Any and all reports, summaries, memoranda, notes, correspondence, and other records regarding the Nakamoto Group inspections of TCDF that took place in November 2021 and from March 29, 2022 through March 31, 2022, including but not limited to:*
    a. *Any and all correspondence, meeting notes, and other records regarding the need for, timing of, and scheduling of each of these inspections;*
    b. *Any and all documents reviewed pre-inspection by the inspection team(s);*
    c. *Any and all checklists, interview forms, and other forms and tools used during the inspection;*
    d. *The cover letter, G-324 and G-324A Inspection Form(s), and any and all supporting documentation for each of these inspections;*
    e. *Any and all records regarding the out-brief(s) conducted by the Nakamoto inspection team(s) with ICE officials and TCDF staff at the time of each of these inspections;*
    f. *Any and all waivers requested and/or granted regarding any detention standards and/or components thereof;*
    g. *Any and all subsequent corrective action plans developed by ICE ERO and/or CoreCivic; and*
    h. *Any and all documentation regarding the implementation of such corrective action plans.*

11. *Any and all records regarding all other audits and inspections, whether routine or otherwise, whether announced or unannounced, whether by federal, state, or local entities, that occurred at TCDF from February 4, 2022 through the date of processing of this request, including but not limited to any such audits or inspections regarding the U.S. Marshals Service population and/or the Torrance County population at TCDF.*

12. *Any and all records regarding the transfer of individuals in ICE custody to TCDF, as well as any and all records regarding the transfer of individuals in ICE custody from TCDF to other detention facilities, subsequent to the March 16, 2022 DHS OIG alert regarding TCDF (# OIG-22-31), including but not limited to records regarding any deliberations on such transfers and/or conditions to be fulfilled prior to such transfers. Please note that this item is not a request for the names of any such individuals transferred or other personally identifiable information regarding such individuals.*

13. *Any and all records regarding the potential, anticipated, or actual transfer of female individuals in ICE custody to TCDF.*

14. *Any and all reports, summaries, memoranda, notes, correspondence, and other records regarding Representative Melanie Stansbury's visit to TCDF on March 21, 2022, including but not limited to:*
    a. *Logs and other records comprehensively identifying all housing units occupied by individuals in ICE custody as of 7:00 A.M. on the date of Representative Melanie Stansbury's visit;*
    b. *Logs and other records comprehensively identifying all housing units visited by Representative Melanie Stansbury during her visit; and*
    c. *Any and all records regarding any actual or attempted movement on that date of individuals in ICE custody from their housing units to the gymnasium or any outdoor yard area whether for routine recreation activities or otherwise.*

15. *Any and all policies, directives, rules, interpretations, post orders, instructions, procedures, and guidance that were in effect for CoreCivic personnel at TCDF from February 1, 2022 through the date of processing of this request or were created, received, modified, amended, and/or supplemented from February 1, 2022 through the date of processing of this request, regarding preparations for and/or conduct during inspections, audits, and oversight visits, including but not limited to general housekeeping, cleaning and maintenance, accompaniment of inspectors, auditors, and visitors by CoreCivic personnel, and whether and how inspectors, auditors, and visitors are to communicate with detainees and inmates.*

16. *Any and all records regarding TCDF staffing from February 1, 2022 through the date of processing of this request, including:*
    a. *Staffing reports, charts, matrixes, plans, and proposals;*
    b. *Disaggregated records regarding staffing of security/correctional positions, medical and mental health positions, maintenance positions, and other positions;*
    c. *Designation of any posts or positions as essential;*
    d. *Records regarding temporary duty assignment (TDY) staffing;*
    e. *Records regarding overtime shifts;*
    f. *Records regarding the number of hours per week that CoreCivic Chief Medical Officer Keith Ivens has provided direct medical services at TCDF*

> *and/or served as medical director or physician at TCDF, including but not limited to "call" or other after-hours availability;*
> g. *Records regarding vacant positions and the duration of any such vacancies;*
> h. *Records regarding the number of new hires, the number of employees in pre-service training, and the number of employees awaiting ICE clearance; and*
> i. *Records regarding the number of employees whose employment ended, including those who quit, were fired, were let go, and/or failed to complete any probationary period.*
>
> 17. *Any and all policies, directives, rules, orders, and instructions that were in effect at TCDF as of February 1, 2022 regarding the following, as well as any modifications of and supplements to any such records through the date of processing of this request:*
>     a. *Mandatory overtime for CoreCivic personnel;*
>     b. *Temporary duty assignment (TDY) staffing;*
>     c. *Environmental health and safety, including but not limited to preventative maintenance, regular inspections, surveys of environmental health conditions, availability of safe potable water, and general housekeeping;*
>     d. *The processing of work orders for facility maintenance and/or repairs;*
>     e. *Commissary; and*
>     f. *Compliance with the Fraihat court order and ICE's Pandemic Response Requirements.*
>
> 18. *The TCDF detainee handbook that was in effect as of February 1, 2022, as well as any modifications, updates, supplements, or other versions of such handbook from that date through the date of processing of this request.*

Exh. 1.

60. ICE designated this request as FOIA request no. 2022-ICFO-14041. Exh. 2.

61. ICE acknowledged receipt of request no. 2022-ICFO-14041 on May 3, 2022. Exh. 3.

62. ICE did not make a decision on May 3, 2022 on the question of expedited processing of FOIA request no. 2022-ICFO-14041.

63. Since May 3, 2022, ICE has not communicated at all with Plaintiff or Plaintiff's counsel regarding FOIA request no. 2022-ICFO-14041.

64. To date, ICE has failed to accept or deny Plaintiff's request for expedited processing of FOIA request no. 2022-ICFO-14041.

65. ICE has failed to provide any determination letter responsive to FOIA request no. 2022-ICFO-14041.

66. ICE has not yet conducted an actual timely search for records requested in FOIA request no. 2022-ICFO-14041.

67. ICE has not yet produced any records responsive to FOIA request no. 2022-ICFO-14041.

## V. CLAIMS FOR RELIEF

### COUNT ONE: VIOLATION OF THE FREEDOM OF INFORMATION ACT
### 5 U.S.C. § 552(a)(6)(E)
### DENIAL OF EXPEDITED PROCESSING

68. Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

69. Plaintiff sought expedited processing of its request based on several factors demonstrating a compelling need as articulated in its original request to ICE. 5 U.S.C. § 552(a)(6)(E); 6 C.F.R. § 5.5(e)(3).

70. Plaintiff has demonstrated a compelling need for the expedited processing of its FOIA request.

71. ICE's failure to grant Plaintiff's request for expedited processing constitutes an unlawful withholding of agency records in violation of the FOIA.

72. Plaintiff has constructively exhausted all available administrative remedies.

### COUNT TWO: VIOLATION OF THE FREEDOM OF INFORMATION ACT
### 5 U.S.C. §§ 552(a)(4)(B), 552(a)(3)(A), and 552(a)(6)
### UNLAWFUL WITHHOLDING OF AGENCY RECORDS

73. Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

74. Plaintiff has a legal right under the FOIA to the timely search and release of non-exempt agency records responsive to its May 3, 2022 FOIA request.

75. No legal basis exists for ICE's failure to adequately and timely search for and release responsive agency records in compliance with the FOIA's time limits.

76. ICE's failure to make reasonable and timely efforts to search for and release responsive agency records constitutes an unlawful withholding under the FOIA that this Court can and should remedy through declaration and injunction.

77. ICE has also failed to make "promptly available" responsive records to Plaintiff. 5 U.S.C. § 552(a)(3)(A).

78. Because ICE has failed to comply with the FOIA's time limits—including its failure to provide a simple determination to Plaintiff within the FOIA's time limits—Plaintiff has constructively exhausted its administrative remedies.

## VI.   REQUEST FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court:

1. Enter judgment in favor of Plaintiff and against Defendant;
2. Order Defendant to process Plaintiff's FOIA request expeditiously in accordance with 5 U.S.C. § 552(a)(6)(E) and 6 C.F.R. § 5.5(e);
3. Declare Defendant's withholdings under the FOIA unlawful and enjoin these unlawful withholdings;
4. Issue an injunction ordering Defendant to conduct a prompt and adequate search for all responsive records, determine which, if any, portions of such records are exempt, and require Defendant to release the remaining portion of these agency records;

5. Award Plaintiff reasonable costs and attorney's fees pursuant to 5 U.S.C. § 552(a)(4)(E) and/or 28 U.S.C. § 2412(d)(1)(A); and

6. Award Plaintiff such further relief as the Court deems just, equitable, and appropriate.

Submitted: June 13, 2022            Respectfully submitted by:

*/s/ Rebecca Sheff*
Rebecca Sheff
New Mexico Bar No. 159065
ACLU OF NEW MEXICO
P.O. Box 566
Albuquerque, NM 87103
T: (505) 266-5915
F: (505) 266-5916
rsheff@aclu-nm.org

Christopher Benoit
New Mexico Bar No. 15097
COYLE & BENOIT, PLLC
2515 N. Stanton Street
El Paso, TX 79902
T: (915) 532-5544
F: (915) 532-5566
chris@coylefirm.com

*Counsel for Plaintiff*