**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**


**INNOVATION LAW LAB,**

       **Plaintiff,**

  **v.**                                                     **Civ. No.** 2:22-cv-00443-SMV-KRS

**U.S. IMMIGRATION AND**
**CUSTOMS ENFORCEMENT,**

       **Defendant.**


<u>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY**
**INJUNCTION**</u>

Rebecca Sheff
New Mexico Bar No. 159065
ACLU OF NEW MEXICO
P.O. Box 566
Albuquerque, NM 87103
T: (505) 266-5915
F: (505) 266-5916
rsheff@aclu-nm.org

Christopher Benoit
New Mexico Bar No. 15097
COYLE & BENOIT, PLLC
2515 N. Stanton Street
El Paso, TX 79902
T: (915) 532-5544
F: (915) 532-5566
chris@coylefirm.com

*Counsel for Plaintiff*

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 2

    ICE Contracts to Detain Noncitizens at the Torrance County Detention Facility ...................... 2

    DHS Office of Inspector General Calls for Immediate Depopulation of Facility ..................... 5

    ICE Disputes DHS OIG Findings and Refuses to Depopulate the Facility .............................. 6

    Plaintiff's FOIA Request ...................................................................................................... 8

LEGAL STANDARD ................................................................................................... 10

ARGUMENT ................................................................................................................ 11

    I.    Plaintiff Is Likely to Prevail on the Merits. ................................................................. 11

    II.    Plaintiff Faces Irreparable Harm. ............................................................................... 18

    III.    The Balance of Equities Favors a Preliminary Injunction. ........................................... 21

    IV.    The Public Interest Favors an Injunction. .................................................................. 22

CONCLUSION ............................................................................................................. 23

## TABLE OF AUTHORITIES

**Cases**

*Aguilera v. FBI*, 941 F. Supp. 144 (D.D.C. 1996) ................................................................. 10, 13

*Al-Fayed v. CIA*, 254 F.3d 300 (D.C. Cir. 2001) .......................................................................... 16

*Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, 470 F. Supp. 3d 32 (D.D.C. 2020) ........................................................................................................................................... passim

*Am. Oversight v. U.S. Dep't of State*, 414 F. Supp. 3d 182 (D.D.C. 2019) ............... 10, 12, 20, 23

*Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 933 F.3d 1088 (9th Cir. 2019) ........................ 22

*Brennan Ctr. for Justice v. Dep't of Commerce*, 498 F. Supp. 3d 87 (D.D.C. 2020) ................... 22

*Castillo v. U.S. Dep't of Homeland Sec.*, 2011 WL 13285714 (D.N.M. May 27, 2011) ............. 15

*Citizens for Responsibility & Ethics in Washington v. FEC*, 711 F.3d 180 (D.C. Cir. 2013) ...... 11

*Cleaver v. Kelley*, 427 F. Supp. 80 (D.D.C. 1976) ................................................................. 10, 13

*Clemente v. FBI*, 71 F. Supp. 3d 262 (D.D.C. 2014) .................................................................... 12

*Ctr. for Pub. Integrity v. U.S. Dep't of Defense*, 411 F. Supp. 3d 5 (D.D.C. 2019) ............... 12, 20

*Denver Homeless Out Loud v. Denver, Colorado*, 32 F.4th 1259 (10th Cir. 2022) ..................... 10

*Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749 (1989) ............... 16

*Documented NY v. U.S. Dep't of State*, 2021 WL 4226239 (S.D.N.Y. Sept. 16, 2021) ............... 22

*Edmonds v. FBI*, 417 F.3d 1319 (D.C. Cir. 2005) ........................................................................ 13

*Electronic Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30 (D.D.C. 2006) ........... passim

*EPA v. Mink*, 410 U.S. 73 (1973), *superseded by statute*, Freedom of Immigration Act, Pub. L. No. 93-502, 88 Stat. 1561 (1974) ............................................................................................ 19

*Fraihat v. U.S. Imm. & Customs Enf.*, 445 F. Supp. 3d 709 (C.D. Cal. Apr. 20, 2020) .............. 14

*Friends of Animals v. Bernhardt*, 15 F. 4th 1254 (10th Cir. 2021) .............................................. 11

*Jacksonville Port Auth. v. Adams*, 556 F.2d 52 (D.C. Cir. 1977) ................................................ 23

*Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 895 F.3d 770 (D.C. Cir. 2018) ................ 12

*Landmark Legal Found. v. EPA*, 910 F. Supp. 2d 270 (D.D.C. 2012) ......................................... 12

*Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246 (D.D.C. 2005) .......... 16

*Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221 (10th Cir. 2019) ............................... 10

*Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004) ............................................. 22

*Nken v. Holder*, 556 U.S. 418 (2009) .......................................................................................... 10

*NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978) ......................................................... 11

*Nuclear Watch New Mexico v. U.S. Dep't of Energy, Nat'l Nuclear Sec. Admin.*, 2007 WL 9729204 (D.N.M. Sept. 19, 2007) ...................................................................... 11, 13, 19, 20

*Payne Enters., Inc. v. United States*, 837 F.2d 486 (D.C. Cir. 1988) ..................................... 10, 20

*Protect Democracy Project, Inc. v. U.S. Dep't of Defense*, 263 F. Supp. 3d 293 (D.D.C. 2017) 10, 21

*Sai v. TSA*, 54 F. Supp. 3d 5 (D.D.C. 2014) ................................................................. 20

*Seavey v. Dep't of Justice*, 266 F. Supp. 3d 241 (D.D.C. 2017)....................................... 19

*Transgender Law Ctr. v. Immigration & Customs Enf.*, 33 F.4th 1186 (9th Cir. 2022) .............. 21

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749 (1989)......... 19

*Unknown Parties v. Nielsen*, 2020 WL 813774 (D. Ariz. Feb. 19, 2020) .................................... 17

*Washington Post v. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61 (D.D.C. 2006)................. 13, 22

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................... 10

*Wong Wing v. United States*, 163 U.S. 228 (1896)......................................................... 3

**Statutes**

5 U.S.C. § 552(a)(4)(A)(viii)(II)(aa)............................................................................. 11

5 U.S.C. § 552(a)(4)(B) ........................................................................................... 11

5 U.S.C. § 552(a)(6)(A)(i) ........................................................................................ 11

5 U.S.C. § 552(a)(6)(C)(i) ........................................................................................ 11

5 U.S.C. § 552(a)(6)(E)........................................................................................ 18, 21

5 U.S.C. § 552(a)(6)(E)(i) .................................................................................... passim

5 U.S.C. § 552(a)(6)(E)(ii)........................................................................................ 11

5 U.S.C. § 552(a)(6)(E)(iii)........................................................................................ 12

**Regulations**

6 C.F.R. § 5.5(e) ........................................................................................................ 9

6 C.F.R. § 5.5(e)(1).............................................................................................. 13, 18

6 C.F.R. § 5.5(e)(1)(i) .............................................................................................. 14

6 C.F.R. § 5.5(e)(1)(ii) .............................................................................................. 15

6 C.F.R. § 5.5(e)(1)(iii)............................................................................................. 17

6 C.F.R. § 5.5(e)(1)(iv) ............................................................................................. 17

6 C.F.R. § 5.5(e)(4).............................................................................................. 12, 21

6 C.F.R. § 5.6(c)....................................................................................................... 12

**Secondary Sources**

Andrea Castillo, "'Egregious' conditions at ICE facility spark watchdog call for relocation of detainees," *Los Angeles Times* (Mar. 18, 2022), https://www.latimes.com/world-nation/story/2022-03-18/citing-egregious-conditions-inspector-called-for-removal-of-immigrant-detainees-ice-refused............................................................................... 15

Austin Fisher, "ICE brings more people into Torrance detention center, congresswoman's staff confirms," *Source NM* (Apr. 22, 2022), https://sourcenm.com/2022/04/22/ice-moves-more-people-into-torrance-detention-center-congresswomans-staff-confirms/ .................................. 7

Ben Fox, "Report finds unsafe conditions in New Mexico migrant jail," *ABC News* (Mar. 18, 2022), https://abcnews.go.com/Politics/wireStory/reports-finds-unsafe-conditions-mexico-migrant-jail-83528839 ........................................................................................ 15

Bennie G. Thompson & Nanette Diaz Barragan, Letter to DHS Secretary Mayorkas and ICE Acting Director Johnson, *Committee on Homeland Security, U.S. House of Representatives* (Mar. 24, 2022), https://homeland.house.gov/imo/media/doc/letter_to_dhs_requesting_shutdown_of_nm_facility.pdf ......................................................................................................................... 15

CoreCivic, *Torrance County Detention Facility*, https://www.corecivic.com/facilities/torrance-county-detention-facility (last visited June 12, 2022) ..................................................... 2

Dareh Gregorian, "DHS inspector general calls for detainees to be moved from 'unsanitary' ICE facility," *NBC News* (Mar. 18, 2022), https://www.nbcnews.com/politics/immigration/dhs-inspector-general-calls-detainees-moved-unsanitary-ice-facility-rcna20630 .......................... 15

Detention Watch Network, *Expose and Close* (Nov. 2012), https://www.detentionwatchnetwork.org/pressroom/reports/2012/expose-and-close .............. 19

Geneva Sands, "Mold and Clogged Toilets at ICE Center Spark Watchdog Call for 'Immediate' Removal of Detainees," (Mar. 18, 2022), https://www.cnn.com/2022/03/18/politics/dhs-ice-immigration-facility-conditions/index.html ......................................................................... 5, 15

Innovation Law Lab, *Process by Torment: Immigration Experiences of Persons Detained at the Otero County Processing Center* (Jan. 2021), https://innovationlawlab.org/blog/new-report-documents-systemic-abuse-at-a-new-mexico-immigrant-detention-center/ .......................... 4, 5

*Intergovernmental Service Agreement Between the United States Department of Homeland Security U.S. Immigration and Customs Enforcement Office of Enforcement and Removal Operations and Torrance County, New Mexico*, https://www.documentcloud.org/documents/22058584-tcdf-intergovernmental-service-agreement?responsive=1&title=1 (last visited June 12, 2022) ............................................... 2, 3

Letter to DHS CRCL, "Severe Violations of Due Process and Inhumane Conditions at Torrance County Detention Facility" (Nov. 23, 2021), https://www.americanimmigrationcouncil.org/sites/default/files/research/compla1.pdf .......... 5

*Management Agreement Between Torrance County, New Mexico and CoreCivic, Inc.*, https://www.documentcloud.org/documents/22058585-049-management-agreement-october-2019?responsive=1&title=1 (last visited June 12, 2022) .......................................................... 3

Maria Sacchetti, "Inspector general, ICE clash over conditions at immigration detention facility in New Mexico," *The Washington Post* (Mar. 18, 2022), https://www.washingtonpost.com/national-security/2022/03/18/ice-detention-unsanitary-new-mexico/ ............................................................................................................................. 15

Nat'l Imm. Justice Ctr., *Lives in Peril: How Ineffective Inspections Make ICE Complicit in Detention Center Abuse* (Oct. 21, 2015), https://immigrantjustice.org/research-items/report-lives-peril-how-ineffective-inspections-make-ice-complicit-detention-center........................ 19

Nat'l Immigration Justice Ctr., *Exposing ICE Detention Contracts and Inspections: Transparency Project*, https://immigrantjustice.org/transparency/detention (last visited June 12, 2022) ................................................................................................................................. 8

Oriana Gonzalez, "DHS watchdog calls for removal of ICE detainees due to 'egregious' conditions," *Axios* (Mar. 18, 2022), https://www.axios.com/dhs-ice-detainees-removal-poor-living-conditions-2eaf60c7-14c0-46a5-9c0b-fb4d496227cf.html............................................. 15

Press Release, "Congresswoman Stansbury Calls for Further Oversight on Torrance Facility," *Office of Rep. Melanie Stansbury* (Mar. 21, 2022), https://stansbury.house.gov/media/press-releases/congresswoman-stansbury-calls-further-oversight-torrance-facility ......................... 15

Press Release, "N.M. Congressional Democrats Condemn Inhumane Conditions at Torrance County Detention Facility," *Office of Sen. Martin Heinrich* (Mar. 18, 2022), https://www.heinrich.senate.gov/press-releases/nm-congressional-democrats-condemn-inhumane-conditions-at-torrance-county-detention-facility ...................................................... 15

Rep. Melanie Stansbury, *TCDF ICE Reports*, https://stansbury.house.gov/transparency/TCDF-ICE-Reports (last visited June 12, 2022) ........................................................................... 8, 14

U.S. Dep't of Homeland Sec. Office of Inspector Gen., *Capping Report: Observations of Unannounced Inspections of ICE Facilities in 2019*, OIG-20-45 (July 1, 2022), https://www.oig.dhs.gov/sites/default/files/assets/2020-07/OIG-20-45-Jul20.pdf..................... 4

U.S. Dep't of Homeland Sec. Office of Inspector Gen., *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements*, OIG-18-67 (June 26, 2018) https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf....................................................................................................................................... 4

U.S. Immigration & Customs Enforcement, *2011 Operations Manual ICE Performance-Based National Detention Standards*, https://www.ice.gov/detain/detention-management/2011 (last visited June 12, 2022) ............................................................................................................. 3

U.S. Immigration & Customs Enforcement, *Facility Inspections*, https://www.ice.gov/detain/facility-inspections (last visited June 12, 2022) ............................ 3

U.S. Immigration & Customs Enforcement, *Torrance County Detention Facility*, https://www.ice.gov/detain/detention-facilities/torrance-county-detention-facility (last visited June 12, 2022)....................................................................................................................... 2

**INTRODUCTION**

The U.S. Department of Homeland Security Office of Inspector General (DHS OIG) conducted an inspection of the Torrance County Detention Facility (TCDF) in February 2022 and took the exceptional step of publishing an urgent alert recommending that U.S. Immigration and Customs Enforcement (ICE) immediately remove all individuals detained there because of deplorable and dangerous conditions.

In response, ICE challenged the DHS OIG's factual findings, rejected the oversight agency's recommendation, and transferred additional individuals into the detention facility.

In this context, on May 3, 2022, Plaintiff Innovation Law Lab (Law Lab) filed a Freedom of Information Act (FOIA) request with ICE seeking records that shed light on ICE's response to the DHS OIG's urgent alert. Plaintiff requested expedited processing of its FOIA request.

Plaintiff seeks these records both to assist its efforts on behalf of individuals detained in ICE custody at TCDF and to ensure real-time public oversight and accountability for ICE. Responsive records will directly inform Plaintiff's work providing individuals detained in ICE custody at TCDF with access to pro bono counsel. Responsive records will further enable Plaintiff to engage in meaningful and effective advocacy. ICE's resistance to the DHS OIG's recommendation to immediately depopulate TCDF has already caused widespread and exceptional public attention and media interest. Because the DHS OIG investigation into TCDF is ongoing, expedited processing of Plaintiff's FOIA request is critical to Plaintiff's ability to effectively shape public opinion and policymakers' actions on this rapidly evolving matter.

Defendant has not granted or denied Plaintiff's request for expedited processing of Plaintiff's FOIA request. Since May 3, 2022, Defendant has not communicated at all with

Plaintiff regarding Plaintiff's FOIA request nor has Defendant produced any responsive records to Plaintiff.

Plaintiff now respectfully moves for a preliminary injunction and requests that the Court order that Defendant produces all non-exempt records responsive to Plaintiff's FOIA request within 30 days of any order by the Court, or by a date that the Court deems appropriate.

## BACKGROUND

### *ICE Contracts to Detain Noncitizens at the Torrance County Detention Facility*

TCDF is located in Estancia, New Mexico and is owned and operated by CoreCivic, Inc, one of the largest private prison corporations in the United States. Exh. 1 (Declaration of Ian Philabaum) at ¶ 3; U.S. Immigration & Customs Enforcement, *Torrance County Detention Facility*, https://www.ice.gov/detain/detention-facilities/torrance-county-detention-facility (last visited June 12, 2022); CoreCivic, *Torrance County Detention Facility*, https://www.corecivic.com/facilities/torrance-county-detention-facility (last visited June 12, 2022). ICE routinely contracts with local government entities to provide civil immigration detention for ICE detainees through Intergovernmental Service Agreements (IGSAs). Those local government entities then enter into separate agreements with private prison corporations to actually conduct the detention services. In 2019, ICE entered into an IGSA with Torrance County for the detention of individuals in ICE custody. *Intergovernmental Service Agreement Between the United States Department of Homeland Security U.S. Immigration and Customs Enforcement Office of Enforcement and Removal Operations and Torrance County, New Mexico*, https://www.documentcloud.org/documents/22058584-tcdf-intergovernmental-service-agreement?responsive=1&title=1 (last visited June 12, 2022) [hereinafter *Intergovernmental Service Agreement*]. Torrance County entered into an agreement with CoreCivic for such

individuals to be detained at TCDF pursuant to the IGSA with ICE in the same year. *Management Agreement Between Torrance County, New Mexico and CoreCivic, Inc.*, https://www.documentcloud.org/documents/22058585-049-management-agreement-october-2019?responsive=1&title=1 (last visited June 12, 2022) [hereinafter *Management Agreement*].

Individuals in ICE custody, including at TCDF, are in civil detention, which is non-criminal and not intended under the law to function as punishment. *Wong Wing v. United States*, 163 U.S. 228, 235 (1896). The conditions of their confinement at TCDF are governed by ICE's 2011 Performance-Based National Detention Standards (PBNDS), which set out the minimum standards to which ICE contractors must adhere on a range of specific matters including health and safety issues. Exh. 1 at ¶ 5; U.S. Immigration & Customs Enforcement, *2011 Operations Manual ICE Performance-Based National Detention Standards*, https://www.ice.gov/detain/detention-management/2011 (last visited June 12, 2022). The Torrance County IGSA with ICE incorporates the 2011 PBNDS as does the contract between the County and CoreCivic. Both the County and CoreCivic are contractually obligated to abide by the 2011 PBNDS at TCDF. *Intergovernmental Service Agreement* at 6, 11; *Management Agreement* at 1. The IGSA for TCDF also sets out specific staffing requirements. *Intergovernmental Service Agreement* at 7.

ICE relies on internal inspections—typically conducted by a contractor known as the Nakamoto Group—to assess facilities' compliance with the 2011 PBNDS. Exh. 1 at ¶ 13; U.S. Immigration & Customs Enforcement, *Facility Inspections*, https://www.ice.gov/detain/facility-inspections (last visited June 12, 2022). Based on a DHS OIG report issued in 2018 and extensive documentation by attorneys and advocates who support detained individuals, it is well-known that the Nakamoto Group's inspection practices are not consistently thorough and that

their inspections do not fully examine actual conditions or identify all deficiencies. Exh. 1 at

¶ 13; U.S. Dep't of Homeland Sec. Office of Inspector Gen., *ICE's Inspections and Monitoring*

*of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements*, OIG-

18-67 (June 26, 2018) https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-

Jun18.pdf; Innovation Law Lab, *Process by Torment: Immigration Experiences of Persons*

*Detained at the Otero County Processing Center* at 30–32, 49–50 (Jan. 2021),

https://innovationlawlab.org/blog/new-report-documents-systemic-abuse-at-a-new-mexico-

immigrant-detention-center/ [hereinafter *Process by Torment*]. The DHS OIG occasionally

conducts its own inspections of detention facilities and has raised concerns in the past about

ICE's failure to ensure safe and humane treatment of the individuals in its custody at various

facilities across the United States. Exh. 1 at ¶ 9; *see, e.g.*, U.S. Dep't of Homeland Sec. Office of

Inspector Gen., *Capping Report: Observations of Unannounced Inspections of ICE Facilities in*

*2019*, OIG-20-45 (July 1, 2022), https://www.oig.dhs.gov/sites/default/files/assets/2020-07/OIG-

20-45-Jul20.pdf. ICE typically concurs with the DHS OIG's recommendations regarding

deficiencies to be remedied by the agency. *Id.*

      Since August 2019, Law Lab has been providing pro bono legal services at TCDF, both

in-person and remotely. Exh. 1 at ¶ 4. Law Lab has also been engaging regularly in advocacy

related to the living conditions faced by individuals in ICE custody at TCDF, including non-

compliance with the 2011 PBNDS. *Id.* at ¶ 5. In November 2021, Law Lab co-authored a

complaint to the DHS Office of Civil Rights and Civil Liberties (CRCL) on the dangerous

conditions suffered by Haitians detained at TCDF, including medical neglect, inedible food, and

contaminated drinking water. *Id.* at ¶ 8; Letter to DHS CRCL, "Severe Violations of Due Process

and Inhumane Conditions at Torrance County Detention Facility" at 4, 7, 9–10 (Nov. 23, 2021),

https://www.americanimmigrationcouncil.org/sites/default/files/research/compla1.pdf. The

complaint also documented extensive violations of 2011 PBNDS requirements regarding access

to counsel at TCDF. *Id.* at 2–3, 6–8. Law Lab also co-authored a report in January 2021 that

documented how the ICE El Paso field office, whose area of responsibility includes TCDF,

arbitrarily denies and refuses to timely adjudicate parole requests. Exh. 1 at ¶ 7; *Process by*

*Torment* at 57–58.

**DHS Office of Inspector General Calls for Immediate Depopulation of Facility**

On March 18, 2022, in an unprecedented move, the DHS OIG publicly issued a

"management alert" recommending the immediate removal of all individuals in ICE custody

from TCDF. Exh. 2 (DHS OIG Management Alert) at 2, 8; Exh. 1 at ¶ 10. It is rare for the DHS

OIG to issue such an alert, and in particular to do so in the midst of an ongoing investigation.

Exh. 1 at ¶ 11. This was the first time the DHS OIG had called for the immediate removal of

people in ICE custody from a detention facility. *Id.*; Geneva Sands, "Mold and Clogged Toilets

at ICE Center Spark Watchdog Call for 'Immediate' Removal of Detainees," (Mar. 18, 2022),

https://www.cnn.com/2022/03/18/politics/dhs-ice-immigration-facility-conditions/index.html.

During an unannounced in-person inspection of TCDF in February 2022, the DHS OIG

documented critical staffing shortages that led to safety risks and unsanitary living conditions,

including non-functioning moldy sinks, clogged toilets full of human waste, mold, water leaks,

hot water issues, and issues with access to drinking water. Exh. 2 at 3–8; Exh. 1 at ¶ 10. Rather

than waiting to issue its findings in a report at the conclusion of its investigation, the DHS OIG

acted swiftly to sound the alarm. Exh. 2 at 3. In its March 18, 2022 alert, the DHS OIG

announced that it had found TCDF's severe understaffing resulted in contractual violations,

including a failure to comply with the 2011 PBNDS, which posed immediate risks to the health

and safety of staff and detainees. *Id.* at 3–6. At the time of the inspection the facility was at only 54% of required staffing. *Id.* at 3. The March 18, 2022 alert further revealed that ICE had documented staffing shortages at TCDF since at least December 2020, and yet the facility had persistently failed to achieve proper staffing from that time through the DHS OIG's inspection more than a year later. *Id.*

As a result of the severity of its findings, the DHS OIG recommended that ICE immediately relocate all detainees from TCDF and that ICE place no detainees at TCDF unless and until the facility ensures adequate staffing and appropriate living conditions. *Id.* at 8.

### ICE Disputes DHS OIG Findings and Refuses to Depopulate the Facility

ICE did not follow the DHS OIG's recommendation to immediately depopulate TCDF. Instead, ICE disputed the findings, asserting that the DHS OIG falsified or mischaracterized evidence and ignored facts to achieve preconceived conclusions. *Id.* at 13–16; Exh. 1 at ¶ 12. ICE claimed that TCDF had substantially completed repairs addressing all of the conditions identified in the DHS OIG alert but provided no documentation to support its claims. Exh. 2 at 11, 16.

Even as ICE vociferously disputed the DHS OIG's findings at TCDF, the agency took steps in managing the contract for the facility that corroborated the inspectors' concerns. *Id.* at 9, 11. On March 1, 2022, ICE issued a Contract Discrepancy Report regarding staffing shortages at TCDF, which asserted that critically short staffing plans are directly responsible for a breakdown in the overall operational capabilities at TCDF. *Id.* at 9. In the March 1, 2022 Contract Discrepancy Report, ICE also asserted that CoreCivic has not been able to demonstrate the ability to provide a safe environment for staff and noncitizens, or to provide the care necessary to ensure proper maintenance, overall cleanliness, and personal hygiene needs, resulting in ongoing

violations of the IGSA and the 2011 PBNDS. *Id.* Despite this Report, ICE continued to detain people at TCDF. Exh. 1 at ¶ 12.

Amid this dynamic situation, Law Lab continued to provide pro bono legal services to individuals detained in ICE custody at TCDF with the added strain of documenting ongoing issues regarding the substandard conditions at TCDF. Exh. 1 at ¶¶ 16–18. Law Lab advocated for the release of individuals who remained detained at TCDF, including by submitting requests for parole to ICE's El Paso field office, many of which were denied discretionarily by ICE without a reasoned justification. Exh. 1 at ¶ 17.

Nonetheless, Law Lab observed that ICE appeared to pause transfers of people into the facility for less than a month—from around March 18, 2022 until around April 15, 2022. Exh. 1 at ¶ 12. In the meantime, ICE arranged for the Nakamoto Group to conduct an inspection of TCDF's compliance with the 2011 PBNDS. Exh. 1 at ¶ 13; Exh. 3 (Report by the Nakamoto Group) at 1. The Nakamoto Group found that the facility met all of the applicable standards, although it noted that understaffing at TCDF remained a persistent issue. Exh. 3 at 2, 5; Exh. 1 at ¶ 13. An attorney with EPIC, who was at TCDF during the Nakamoto Group's inspection, shared concerns with the Nakamoto inspector regarding access-to-counsel issues and medical neglect at the facility; those issues were not addressed in the Nakamoto Group's inspection report. Exh. 4 (Declaration of Allegra Love) at ¶¶ 2–10. After the Nakamoto Group's report on TCDF was posted publicly on ICE's website, ICE moved quickly to transfer additional people into TCDF, bringing in more than one hundred people in less than a week. Exh. 1 at ¶ 14; Austin Fisher, "ICE brings more people into Torrance detention center, congresswoman's staff confirms," *Source NM* (Apr. 22, 2022), https://sourcenm.com/2022/04/22/ice-moves-more-people-into-torrance-detention-center-congresswomans-staff-confirms/. Transfers into TCDF have continued

on a regular basis since that time. Exh. 1 at ¶ 14; Rep. Melanie Stansbury, *TCDF ICE Reports*, https://stansbury.house.gov/transparency/TCDF-ICE-Reports (last visited June 12, 2022).

As it stands, ICE does not routinely make information about its management of detention contracts available to the public and has not communicated to the public any concrete steps that the agency is taking to ensure the health and safety of individuals in its custody at TCDF. Exh. 1 at ¶ 15; Nat'l Immigration Justice Ctr., *Exposing ICE Detention Contracts and Inspections: Transparency Project*, https://immigrantjustice.org/transparency/detention (last visited June 12, 2022). ICE has not provided an explanation to the public as to why the agency refused to depopulate TCDF or why the agency recently resumed transfers into the facility. Exh. 1 at ¶ 15. The DHS OIG investigation into TCDF remains ongoing at this time. Exh. 2 at 3 n.4; Exh. 1 at ¶ 15.

***Plaintiff's FOIA Request***

Against this backdrop, on May 3, 2022, Plaintiff filed its FOIA request to ICE to obtain agency records relating to ICE's response to the DHS OIG inspection of TCDF and the March 18, 2022 management alert calling for the immediate removal of all ICE detainees from TCDF. Dkt. 1, Exh. 1; Exh. 1 at ¶ 20. Plaintiff requested records regarding the DHS OIG inspection, the DHS OIG alert, and the ICE leadership walk-through of TCDF that took place after the issuance of the alert. Dkt. 1, Exh. 1. Plaintiff also sought records on ICE's response to the DHS OIG alert, including monitoring of facility staffing trends, contract modifications, financial penalties, and policy changes. *Id.* The request also sought records regarding ICE's most recent inspections prior to the DHS OIG inspection, as well as additional audits, inspections, and Congressional visits that took place since March 2022. *Id.*

The request also sought records relating to ICE's prior awareness of the issues documented in the DHS OIG alert, including health, sanitation, and safety issues, as well as CoreCivic's understaffing of the facility. *Id.* Plaintiff requested contract discrepancy reports, financial penalties, quality assurance surveillance plans, and other records that would tend to show the extent to which ICE made use of its contracting tools to address these violations of CoreCivic's contractual obligations at TCDF. *Id.*

In light of ICE's decision to transfer individuals in ICE custody into TCDF after the DHS OIG alert, in direct defiance of the DHS OIG's recommendations, Plaintiff also requested records regarding such transfers. *Id.*

Plaintiff sought expedited processing of its FOIA request. *Id.*; Exh. 1 at ¶ 20. In support of its request for expedited processing, Plaintiff submitted a statement explaining that this FOIA request involves (1) circumstances in which the lack of expedited processing could reasonably be expected to pose an imminent threat to the life or physical safety of individuals in ICE custody at TCDF; (2) an urgency to inform the public about an actual or alleged federal government activity; (3) the loss of substantial due process rights; and (4) a matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence. Dkt. 1, Exh. 1; *see* 5 U.S.C. § 552(a)(6)(E)(i); 6 C.F.R. § 5.5(e).

Defendant designated Plaintiff's FOIA request as request no. 2022-ICFO-14041. *See* Dkt. 1, Exh. 2. Defendant acknowledged receipt of request no. 2022-ICFO-14041 on May 3, 2022. *See* Dkt. 1, Exh. 3. Defendant has not granted or denied Plaintiff's request for expedited processing of Plaintiff's FOIA request, nor has Defendant provided any determination letter regarding Plaintiff's FOIA request. Exh. 1 at ¶ 21. Defendant has not conducted a timely search

for records responsive to Plaintiff's FOIA request and has not produced any responsive records to Plaintiff. *Id.* Plaintiff has received no further communications from Defendant regarding its FOIA request since May 3, 2022. *Id.*

## LEGAL STANDARD

Courts have repeatedly asserted their authority to consider motions for injunctive relief in FOIA actions. *See Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, 470 F. Supp. 3d 32, 36 (D.D.C. 2020); *Am. Oversight v. U.S. Dep't of State*, 414 F. Supp. 3d 182, 186 (D.D.C. 2019); *Protect Democracy Project, Inc. v. U.S. Dep't of Defense*, 263 F. Supp. 3d 293, 298 (D.D.C. 2017); *Electronic Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30, 35 (D.D.C. 2006) [hereinafter *EPIC*]; *Aguilera v. FBI*, 941 F. Supp. 144, 152–53 (D.D.C. 1996); *Cleaver v. Kelley*, 427 F. Supp. 80, 81–82 (D.D.C. 1976). Moreover, "[t]he FOIA imposes no limits on courts' equitable powers in enforcing its terms." *Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988).

In determining whether a preliminary injunction should issue, courts consider four factors: (1) the movant's likelihood of succeeding on the merits of the claim; (2) the irreparable harm that the movant faces; (3) whether the balance of equities weighs in the movant's favor; and (4) whether granting relief would further the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Denver Homeless Out Loud v. Denver, Colorado*, 32 F.4th 1259, 1277 (10th Cir. 2022). The final two factors merge when the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). When a party seeks an injunction that mandates action, the party must make a "strong showing" that the likelihood-of-success-on-the-merits and the balance-of-harms factors "tilt in [their] favor." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (internal quotation marks and citation omitted).

Plaintiff's motion roundly satisfies all four prongs of the test for injunctive relief. *See, e.g.*, *Am. Immigration Council*, 470 F. Supp. 3d at 36–39 (granting plaintiff's motion for preliminary injunction and directing DHS and ICE to produce all non-exempt responsive records within two months relating to ICE's response to the COVID-19 pandemic, because "Plaintiff's request concerns a serious and time-sensitive matter").

## ARGUMENT

### I.    Plaintiff Is Likely to Prevail on the Merits.

The basic purpose of FOIA is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Friends of Animals v. Bernhardt*, 15 F. 4th 1254, 1260 (10th Cir. 2021) (citing *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)). The FOIA is intended to "allow citizens to learn what their government is doing and how it is being done." *Nuclear Watch New Mexico v. U.S. Dep't of Energy, Nat'l Nuclear Sec. Admin.*, 2007 WL 9729204 at *2 (D.N.M. Sept. 19, 2007). The FOIA statute requires that an agency make a determination on a FOIA request within twenty working days, unless the agency invokes an additional ten-day extension for requests involving "unusual circumstances." 5 U.S.C. §§ 552(a)(6)(A)(i), 552(a)(4)(A)(viii)(II)(aa). Recognizing that some circumstances would require public information to be made available more quickly, Congress embedded an expedited process into the statutory scheme by which agencies must make determinations within ten days. 5 U.S.C. § 552(a)(6)(E)(ii). An agency's failure to comply with the statutory timeframe to make a determination means a requester has constructively exhausted its administrative remedies and can directly seek review in federal district court. 5 U.S.C. §§ 552(a)(6)(C)(i), 552(a)(4)(B); *Citizens for Responsibility & Ethics in Washington v. FEC*, 711 F.3d 180, 182 (D.C. Cir. 2013).

11

Here, because Defendant has failed to grant or deny Plaintiff's request for expedited processing within the ten-day statutory deadline, and further has failed to make a determination on Plaintiff's FOIA request under the non-expedited timeframe of twenty working days, Plaintiff has therefore constructively exhausted all non-futile administrative remedies and now invokes the Court's justified intervention to order the production of records responsive to its request "as soon as practicable" in light of its exigent nature. 5 U.S.C. § 552(a)(6)(E)(iii); 6 C.F.R. §§ 5.5(e)(4), 5.6(c). *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 895 F.3d 770, 775–76 (D.C. Cir. 2018) ("Congress underscored the importance it attached to prompt responses by allowing judicial recourse, bypassing administrative exhaustion, if an agency fails to meet statutory timetables for disclosure or to justify its delay in making nonexempt records available upon request.").

Injunctive relief ordering Defendant to produce responsive records within thirty days of any order by the Court is warranted given the urgent nature of Plaintiff's request. *Ctr. for Pub. Integrity v. U.S. Dep't of Defense,* 411 F. Supp. 3d 5, 12 (D.D.C. 2019) (granting injunction because the "value of the information would be lessened or lost absent expedited processing"); *Landmark Legal Found. v. EPA*, 910 F. Supp. 2d 270, 275 (D.D.C. 2012) ("[C]ourts have equitable powers to order agencies to act within a particular time frame[.]"); *Clemente v. FBI*, 71 F. Supp. 3d 262, 269 (D.D.C. 2014) (a court "may use its equitable powers to require the agency to process documents according to a court-imposed timeline"). Courts routinely give weight to the time-sensitive nature of the records requested when ordering agencies to produce records within designated deadlines.[1] In the absence of the Court's intervention, the agency's failure to

---

[1] *See, e.g.*, *Am. Immigration Council*, 470 F. Supp. 3d at 39 (ordering records on ICE's response to COVID-19 pandemic produced within two months); *Am. Oversight*, 414 F. Supp. 3d at 187 (ordering communications relating to presidential impeachment query produced within

adhere to the FOIA provisions regarding expedited processing will go unchecked. *EPIC*, 416 F. Supp. 2d at 39 ("The legislative history of the amendments makes clear that … [Congress's] intent was to 'give the [expedited] request priority for processing *more quickly than otherwise would occur.*'") (citation omitted); *Nuclear Watch New Mexico*, 2007 WL 9729204 at *3 ("A bona fide request for production of documents under FOIA must be honored in a timely fashion or the purpose of the Act is vitiated."). Setting a Court-imposed deadline to produce records implicating a matter of public urgency—ICE's defiance of the DHS OIG's unprecedented call for a detention facility to be immediately depopulated due to deplorable and dangerous conditions—is therefore necessary in this case to effectuate Plaintiff's statutory right to expedited processing. *Edmonds v. FBI*, 417 F.3d 1319, 1323 (D.C. Cir. 2005) ("[E]xpedited processing of a FOIA request is a statutory right, not just a matter of court procedure."); *EPIC*, 416 F. Supp. 2d at 40–41; *Washington Post v. Dep't of Homeland Sec.*, 459 F. Supp. 2d. 61, 75 (D.D.C. 2006) (noting that in the absence of a preliminary injunction, "plaintiff would lose out on its statutory right to expedited processing and on the time-sensitive public interests which underlay the request").

Plaintiff is likely to succeed on the merits of its request for expedited processing. The DHS FOIA regulations set forth four separate bases for expedited processing, any one of which is sufficient. 6 C.F.R. § 5.5(e)(1). As described in Plaintiff's FOIA request and supporting documentation, Plaintiff seeks records on an urgent basis because responsive records will help guide on-the-ground efforts in real time that seek to mitigate the imminent threats to life and

---

approximately one month); *EPIC*, 416 F. Supp. 2d at 43 (ordering records to inform ongoing national debate about government's warrantless surveillance program produced within one month); *Aguilera*, 941 F. Supp. at 153 (ordering exculpatory FBI records in criminal proceeding produced within approximately one month); *Cleaver*, 427 F. Supp. at 82 (ordering FBI records on covert activities produced within approximately twenty days).

physical safety faced by individuals detained in ICE custody at TCDF. Dkt. 1, Exh. 1; 5 U.S.C.

§ 552(a)(6)(E)(i); 6 C.F.R. § 5.5(e)(1)(i). As a result of ICE's inadequate response to the DHS

OIG management alert, individuals currently detained at TCDF are exposed to mold, unsafe

drinking water, and inoperable and malfunctioning toilets, sinks, and showers, among other

sanitation issues. Exh. 2 at 4–6; Exh. 1 at ¶¶ 18, 22. Such individuals face the imminent risk of

serious health problems resulting from such unsanitary conditions. Exh. 2 at 5, 9; Exh. 1 at ¶¶ 18,

22. Responsive records are likely to shed light on ICE's ongoing failure to ensure that the facility

conducts adequate repairs and maintenance, which exacerbates these issues. Exh. 2 at 5, 9.

Records will tend to show persistent and critical understaffing of TCDF, which hinders personnel

capacity to respond to emergencies within the facility and affects detained individuals' access to

medical care and other basic services, including in complying with court-mandated COVID-19

screenings for medically vulnerable individuals. Exh. 2 at 3, 7, 9; Rep. Melanie Stansbury,

*TCDF ICE Reports*, https://stansbury.house.gov/transparency/TCDF-ICE-Reports (last visited

June 12, 2022); Exh. 1 at ¶ 16; *Fraihat v. U.S. Imm. & Customs Enf.*, 445 F. Supp. 3d 709 (C.D.

Cal. Apr. 20, 2020). This information will aid Plaintiff in ensuring that its pro bono legal services

for individuals detained at TCDF encompass timely and meaningful information on how to

exercise their rights and advice on addressing their immediate concerns about dangerous

conditions at the facility, including how to raise concerns through grievances and other avenues.

Exh. 1 at ¶ 22. This information will further aid Plaintiff in preparing requests for release on

behalf of clients detained at TCDF, defending their rights, and engaging in its own direct

advocacy to elected officials, oversight bodies, and policymakers regarding ICE's inadequate

response to exigent health and safety risks at TCDF. Exh. 1 at ¶¶ 16–18, 22–24, 26.

Plaintiff's request also involves an urgency to inform the public about an actual or

alleged federal government activity. Dkt. 1, Exh. 1; 5 U.S.C. § 552(a)(6)(E)(i); 6 C.F.R.

§ 5.5(e)(1)(ii). Given that ICE has disputed the contents and accuracy of the DHS OIG

management alert, cast doubt on the objectivity of the DHS OIG inspectors, refused to

depopulate the facility, and initiated new transfers into TCDF, there is a heightened concern

shared by members of the public, elected officials, and the news media alike regarding ICE's

acts and omissions since the issuance of the DHS OIG alert.[2] Exh. 1 at ¶¶ 23–24; *see Castillo v.*

*U.S. Dep't of Homeland Sec.*, 2011 WL 13285714 at *2 (D.N.M. May 27, 2011) ("A

---

[2] *See, e.g.*, Maria Sacchetti, "Inspector general, ICE clash over conditions at immigration detention facility in New Mexico," *The Washington Post* (Mar. 18, 2022), https://www.washingtonpost.com/national-security/2022/03/18/ice-detention-unsanitary-new-mexico/; Geneva Sands, "Mold and clogged toilets at ICE center spark watchdog call for 'immediate' removal of detainees," *CNN* (Mar. 18, 2022), https://www.cnn.com/2022/03/18/politics/dhs-ice-immigration-facility-conditions/index.html; Ben Fox, "Report finds unsafe conditions in New Mexico migrant jail," *ABC News* (Mar. 18, 2022), https://abcnews.go.com/Politics/wireStory/reports-finds-unsafe-conditions-mexico-migrant-jail-83528839; Dareh Gregorian, "DHS inspector general calls for detainees to be moved from 'unsanitary' ICE facility," *NBC News* (Mar. 18, 2022), https://www.nbcnews.com/politics/immigration/dhs-inspector-general-calls-detainees-moved-unsanitary-ice-facility-rcna20630; Oriana Gonzalez, "DHS watchdog calls for removal of ICE detainees due to 'egregious' conditions," *Axios* (Mar. 18, 2022), https://www.axios.com/dhs-ice-detainees-removal-poor-living-conditions-2eaf60c7-14c0-46a5-9c0b-fb4d496227cf.html; Bennie G. Thompson & Nanette Diaz Barragan, Letter to DHS Secretary Mayorkas and ICE Acting Director Johnson, *Committee on Homeland Security, U.S. House of Representatives* (Mar. 24, 2022), https://homeland.house.gov/imo/media/doc/letter_to_dhs_requesting_shutdown_of_nm_facility. pdf; Andrea Castillo, "'Egregious' conditions at ICE facility spark watchdog call for relocation of detainees," *Los Angeles Times* (Mar. 18, 2022), https://www.latimes.com/world-nation/story/2022-03-18/citing-egregious-conditions-inspector-called-for-removal-of-immigrant-detainees-ice-refused; Press Release, "N.M. Congressional Democrats Condemn Inhumane Conditions at Torrance County Detention Facility," *Office of Sen. Martin Heinrich* (Mar. 18, 2022), https://www.heinrich.senate.gov/press-releases/nm-congressional-democrats-condemn-inhumane-conditions-at-torrance-county-detention-facility; Press Release, "Congresswoman Stansbury Calls for Further Oversight on Torrance Facility," *Office of Rep. Melanie Stansbury* (Mar. 21, 2022), https://stansbury.house.gov/media/press-releases/congresswoman-stansbury-calls-further-oversight-torrance-facility.

fundamental purpose of the FOIA is to assist citizens in discovering '*what their government is up to*.'") (citing *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)). Although Plaintiff is not a member of the news media, it has substantial capacity to disseminate the records obtained through this FOIA request. Exh. 1 at ¶ 25. The records sought will attract significant public attention—particularly in light of the media coverage and Congressional outcry that ICE's dispute of the DHS OIG alert has already garnered—and will likely lead to publicity in the press and in the halls of Congress. *Id.* at ¶¶ 23–24. Responsive records, if obtained by Plaintiff expeditiously, are likely to immediately influence public discourse on ICE's response to the DHS OIG investigation, which remains ongoing at this time. *Id.* at ¶¶ 15, 23–24; *see, e.g.*, *Am. Immigration Council*, 470 F. Supp. 3d at 37 (recognizing likelihood of success on merits where plaintiff established urgent need for information likely to impact public discourse on ICE's handling of ongoing public health crisis); *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005) (ordering expedited processing and production of records by a date certain given the issue of voter suppression and intimidation "is paramount and expedition of these documents could advance the current debate over the Voting Rights Act"); *cf. Al-Fayed v. CIA*, 254 F.3d 300, 310 (D.C. Cir. 2001) ("Although these topics may continue to be newsworthy, none of the events at issue is the subject of a currently unfolding story."). Plaintiff's effectiveness in influencing public opinion and policymakers' actions during this critical time period is contingent on its access to records showing reliable, accurate, and detailed information on ICE's response to the DHS OIG's unprecedented alert.

Also underscoring the urgency of Plaintiff's request is the loss of substantial due process rights that will occur as a result of Defendant's actions. Dkt. 1, Exh. 1; 5 U.S.C.

§ 552(a)(6)(E)(i); 6 C.F.R. § 5.5(e)(1)(iii). Individuals detained in ICE custody, including at

TCDF, have well-established due process rights. Exh. 1 at ¶¶ 16, 22; *Unknown Parties v.

Nielsen*, 2020 WL 813774 (D. Ariz. Feb. 19, 2020). Responsive records will tend to show that

ICE's inadequate response to the DHS OIG alert is interfering with their ability to meaningfully

exercise their right to seek asylum. Exh. 1 at ¶ 22. As Plaintiff's attorneys and advocates have

witnessed firsthand, the dangerous conditions at TCDF are causing severe physical and

psychological trauma to detained individuals, which hinders their ability to prepare asylum

applications, requests for release, and other filings and testimony. *Id.* at ¶ 18. ICE's defiance in

the wake of the DHS OIG alert is further compromising detained individuals' right to legal

representation, a vital element of which is access to counsel. *Id.* at ¶ 16. As Plaintiff tries to

evaluate potential clients at TCDF and provide them with legal support, Plaintiff has had to

instead divert its scant resources to addressing detained individuals' concerns regarding

immediate health and safety issues. *Id.* at ¶ 18. Expedited processing of Plaintiff's FOIA request

will enable Plaintiff to mobilize elected officials, policymakers, and other stakeholders to

mitigate the conditions at TCDF and advocate for ICE to release individuals detained there. All

of these actions will permit Plaintiff to focus its limited resources on pro bono legal services for

asylum-seekers at TCDF. *Id.* at ¶ 20.

Finally, expedited processing of Plaintiff's FOIA request is particularly crucial because

this request involves a matter of widespread and exceptional media interest in which there exist

possible questions about the government's integrity which affect public confidence. Dkt. 1, Exh.

1; 5 U.S.C. § 552(a)(6)(E)(i); 6 C.F.R. § 5.5(e)(1)(iv). Numerous news outlets have

demonstrated substantial and persistent interest in the living conditions at TCDF and the

treatment of individuals detained in ICE custody there. Exh. 1 at ¶ 24; *see supra* n.2. This media

17

interest has been heightened due to ICE's factual dispute of the DHS OIG alert, as well as ICE's

allegations of bias by the DHS OIG inspection team, ICE's refusal to depopulate the facility, and

ICE's recent decision to resume transfers into TCDF despite unresolved serious health and safety

issues at the facility. Exh. 1 at ¶ 24. These acts and omissions by the agency, combined with

ICE's track record of unreliable internal inspections and resistance to external oversight, have

caused serious and legitimate questions to be raised by the public and in the media as to ICE's

integrity. *Id.* The rapidly unfolding situation at TCDF has further called into question the

agency's ability to ensure that minimum standards and contractual obligations are met. *Id.*

Plaintiff maintains regular contact with members of the press on such matters and has

considerable capacity to disseminate the requested records to media outlets. *Id.* at ¶ 25.

These considerations, whether considered separately or together, are more than sufficient

to meet the standards set out in 5 U.S.C. § 552(a)(6)(E)(i) and 6 C.F.R. § 5.5(e)(1). Ordering

production by a date certain is essential in effectuating Plaintiff's right to expedited processing

under the statute. *EPIC*, 416 F. Supp. 2d at 37. Defendant has violated its statutory duty to timely

make a decision on expedited processing. 5 U.S.C. § 552(a)(6)(E). Plaintiff's request implicates

a matter of the utmost urgency and will concretely impact the life and safety of hundreds of

individuals who are and will be detained in ICE custody at TCDF. For these reasons, Plaintiff

has made a strong showing that it is likely to succeed on the merits of its claims.

## II.    Plaintiff Faces Irreparable Harm.

Plaintiff will suffer irreparable harm if injunctive relief is not granted. Exh. 1 at ¶ 26.

Delay in the release of records responsive to Plaintiff's FOIA request will interfere with

Plaintiff's ability to impact a rapidly evolving situation of national interest in real time, involving

a federal agency's failure to safeguard the rights of individuals held at a dangerous detention

facility. *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) ("Official information that sheds light on an agency's performance of its statutory duties falls squarely within [FOIA's] purpose."). Moreover, ICE's decades-old track record of resisting oversight of its immigration detention system and meaningful scrutiny of conditions at its facilities elevates the urgency of Plaintiff's request. Exh. 1 at ¶¶ 6, 13; Detention Watch Network, *Expose and Close* (Nov. 2012), https://www.detentionwatchnetwork.org/pressroom/reports/2012/expose-and-close; Nat'l Imm. Justice Ctr., *Lives in Peril: How Ineffective Inspections Make ICE Complicit in Detention Center Abuse* (Oct. 21, 2015), https://immigrantjustice.org/research-items/report-lives-peril-how-ineffective-inspections-make-ice-complicit-detention-center. Defendant's response to the DHS OIG's urgent alert and its refusal to depopulate TCDF has drawn public criticism. Exh. 1 at ¶ 24; *see supra* n.2. The FOIA was designed to facilitate scrutiny in this scenario. *See EPA v. Mink*, 410 U.S. 73, 80 (1973), *superseded by statute*, Freedom of Immigration Act, Pub. L. No. 93-502, 88 Stat. 1561 (1974) (FOIA "seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands"); *Seavey v. Dep't of Justice*, 266 F. Supp. 3d 241, 248 (D.D.C. 2017) (ordering production at accelerated rate because information sought exposed "serious gaps in the public's understanding of the role of the FBI and the U.S. government"); *Nuclear Watch New Mexico*, 2007 WL 9729204 at *3 ("Delays under the 'request-and-wait' system can be useful to the government to dissuade requests or to postpone unwelcome disclosures when journalists or others seek records on a suspected or emerging scandal.") (cleaned up).

Importantly, because of the nature of Plaintiff's request and Defendant's track record, time is of the essence; for Plaintiff, policymakers, and the public to act, they must have access to timely information. Exh. 1 at ¶¶ 20, 22–24, 26. The value of the information that Plaintiff endeavors to disseminate in order to safeguard the rights of individuals detained at TCDF and to ensure government transparency is dependent on its prompt production. *See Nuclear Watch New Mexico*, 2007 WL 9729204 at *3 ("Information is often useful only if it is timely.") (citation omitted); *Payne Enters., Inc.*, 837 F.2d at 494 (recognizing that "stale information is of little value"); *Ctr. for Pub. Integrity*, 411 F. Supp. 3d at 12. Delayed release of records in this instance lessens the value of the information because it can in turn prevent Plaintiff from effectively providing legal services to protect detained clients, including to obtain their release from detention, and delay can impede timely advocacy by Plaintiff impacting ICE's response to the health and safety issues documented in the ongoing DHS OIG investigation of TCDF. Exh. 1 at ¶¶ 22–24, 26. Plaintiff will thus be obstructed in its mission to arm the public and policymakers with the information necessary to propel action and accountability. *Id.* at ¶ 26. This constitutes a clear, irreparable injury to Plaintiff. *Am. Immigration Council*, 470 F. Supp. 3d at 38 ("[A] plaintiff may suffer irreparable harm if denied access to information that is highly relevant to an ongoing public debate."); *Am. Oversight*, 414 F. Supp. 3d at 186; *see also Sai v. TSA*, 54 F. Supp. 3d 5, 10 (D.D.C. 2014) ("To be sure, a movant's general interest in timely processing of FOIA requests may be sufficient to establish irreparable harm if the information sought is 'time-sensitive.'") (citation omitted); *EPIC*, 416 F. Supp. 2d at 40 (the "loss" of the "value" of timely information "constitutes a cognizable harm") (citation omitted).

The urgency inherent in Plaintiff's request is undeniable, particularly because the consequences of delay in public oversight of detention conditions can have tragic, irreversible

consequences. Already, Plaintiff's clients at TCDF are enduring physical harm and emotional distress due to the facility's deplorable conditions. Exh. 1 at ¶ 18. Scrutiny is warranted to prevent further physical and psychological harm to individuals detained in ICE custody at TCDF, among other consequences. *Protect Democracy Project, Inc.*, 263 F. Supp. 3d at 301 (finding harm in delayed information regarding legality of airstrikes in Syria because "[m]ilitary strikes cannot be undone"); *Transgender Law Ctr. v. Immigration & Customs Enf.*, 33 F.4th 1186, 1192 (9th Cir. 2022) (government's "stonewalling" of FOIA requests regarding asylum-seeker's "tragic death in federal custody" in New Mexico obstructed advocates' efforts "to ensure an informed citizenry, promote official transparency, and provide a check against government impunity"). This case exemplifies the harm that can result to a requester when the release of relevant, consequential information is delayed. The Court should find that Plaintiff has made a showing of irreparable harm.

### III.    The Balance of Equities Favors a Preliminary Injunction.

The balance of equities favors injunctive relief in this case. In the first instance, Defendant will not be harmed or burdened by "a requirement that it comply with the law," that is, effectuate Plaintiff's right to a prompt release of responsive records. *EPIC*, 416 F. Supp. 2d at 41 (citation omitted). Defendant has failed to make a determination on Plaintiff's request for expedited processing within the statutory timeframe. 5 U.S.C. § 552(a)(6)(E); 6 C.F.R. § 5.5(e)(4). An order from the Court that results in Defendant's compliance with its statutory obligations will thus not burden Defendant. Injunctive relief in this case would merely uphold the open records statutory scheme as envisioned by the legislature.

Nor will granting injunctive relief in Plaintiff's case unduly burden or harm Defendant or other FOIA requesters. *See Am. Immigration Council*, 470 F. Supp. 3d at 39 (finding that

expedited production would impose a "minimal burden" on the agency and the public interest "outweighs any possible harm to other requesters that may result from accelerated processing of this request"); *Documented NY v. U.S. Dep't of State*, 2021 WL 4226239 at *5 (S.D.N.Y. Sept. 16, 2021) (weighing the "compelling need" of Plaintiff's request in determining appropriate rate of production). Other FOIA requesters will not be harmed by a preliminary injunction that enjoins the agency to produce non-exempt records responsive to Plaintiff's FOIA request on an expedited basis, given the urgency of this request. *See Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 933 F.3d 1088, 1095 (9th Cir. 2019) ("While FOIA as a whole favors broad disclosure, the expedited processing provision serves the narrower purpose of prioritizing certain requests over others."); *Brennan Ctr. for Justice v. Dep't of Commerce*, 498 F. Supp. 3d 87, 100–101, 103 (D.D.C. 2020) (noting that agency may move plaintiff's requests "to the front of the expedited processing line" to comply with court-ordered production schedule, and that "hardship on other FOIA requesters is not a bar to relief") (cleaned up); *Washington Post*, 459 F. Supp. at 76 ("[P]ursuant to the statutory provision mandating expedited treatment, the public's interest in expedited processing of the plaintiff's request outweighs any general interest that it has in first-in-first-out processing of FOIA requests.").

## IV.    The Public Interest Favors an Injunction.

An order by the Court in this case to produce responsive records will serve the public interest. First and foremost, as Plaintiff has already noted, one of the FOIA's key functions is to facilitate accountability for government agencies. Courts have long recognized the important function that the FOIA plays in empowering the public with the necessary information to scrutinize governmental activity. *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171–72 (2004) ("FOIA is often explained as a means for citizens to know what their Government

is up to. This phrase should not be dismissed as a convenient formalism. It defines a structural necessity in a real democracy.") (cleaned up).

Here, the information that Plaintiff seeks will help inform real-time advocacy to hold ICE accountable for its response to the DHS OIG investigation and on-the-ground efforts to protect the health and safety of individuals detained in ICE custody at TCDF. Exh. 1 at ¶¶ 22–24, 26; *see Am. Oversight*, 414 F. Supp. 3d at 187 (where information would "directly inform" presidential impeachment investigation and public debate, "[t]he public's interest in disclosure of responsive, non-exempt records is therefore high").

Moreover, as noted in the previous section, holding Defendant accountable to its statutory obligations under the FOIA serves the public interest. *See Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977) (noting "an overriding public interest … in the general importance of an agency's faithful adherence to its statutory mandate"). Requiring that Defendant meet its statutory obligations with respect to Plaintiff's request will help ensure the FOIA processes function for all requesters. Injunctive relief will thus benefit the public interest.

## CONCLUSION

For the reasons described above, Plaintiff has established that it meets the criteria for injunctive relief. Plaintiff therefore respectfully requests the Court to order that Defendant produce all records responsive to Plaintiff's FOIA request within 30 days of any order by the Court, or by a date that the Court deems appropriate.

Submitted: June 13, 2022                      Respectfully submitted by:

                                              */s/ Rebecca Sheff_____*
                                              Rebecca Sheff
                                              New Mexico Bar No. 159065
                                              ACLU OF NEW MEXICO

P.O. Box 566
Albuquerque, NM 87103
T: (505) 266-5915
F: (505) 266-5916
rsheff@aclu-nm.org

Christopher Benoit
New Mexico Bar No. 15097
COYLE & BENOIT, PLLC
2515 N. Stanton Street
El Paso, TX 79902
T: (915) 532-5544
F: (915) 532-5566
chris@coylefirm.com

*Counsel for Plaintiff*