# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**INNOVATION LAW LAB,**

    **Plaintiff,**

v.                                                             Civ. No. 2:22-cv-00443-SMV-KRS

**U.S. IMMIGRATION AND**
**CUSTOMS ENFORCEMENT,**

    **Defendant.**

## DECLARATION OF IAN PHILABAUM

I, Ian Philabaum, declare as follows:

1. I am the Co-Director of the Anticarceral Legal Organizing program at Innovation Law Lab (Law Lab). In this role, I am responsible for overseeing several projects that connect collaborative legal services, data analysis, and community organizing toward the liberation of migrants from ICE custody and the shutdown of immigration detention centers. I make this declaration in support of Law Lab's Motion for a Preliminary Injunction.

2. Law Lab is a non-profit organization that harnesses technology, lawyers, and activists to advance immigrant and refugee justice. Law Lab has vast experience providing pro bono legal services to asylum-seeking immigrants in detention, including establishing pro bono projects in Artesia, New Mexico, and Dilley, Texas, to provide representation for immigrant families in detention.

3. In 2019, Law Lab and partner organizations jointly established the El Paso Immigration Collaborative (EPIC), a pro bono legal project aimed at increasing access to legal representation for individuals detained in ICE custody in the jurisdiction of the El Paso ICE Enforcement and Removal Operations (ICE/ERO) field office. Through its involvement in EPIC,

Law Lab works to win release, provide support, and facilitate legal representation for individuals in ICE custody at five immigration detention facilities in the jurisdiction of the El Paso ICE/ERO field office. These facilities include the Torrance County Detention Facility (TCDF) in Estancia, New Mexico, which is owned and operated by CoreCivic, Inc, one of the largest private prison corporations in the United States.

4.  Since August 2019, Law Lab has been providing pro bono legal services to individuals in ICE custody at TCDF including consultations, orientations, intakes, legal representation for release on parole, and legal representation for release on bond. Law Lab has provided these services both in-person and remotely.

5.  Law Lab has also been engaging regularly in advocacy related to living conditions faced by individuals detained in ICE custody at TCDF, including requests for release because of COVID-19 vulnerabilities pursuant to the *Fraihat v. ICE* injunction, advocacy regarding non-compliance with ICE's Pandemic Response Requirements, and advocacy regarding non-compliance with ICE's 2011 Performance-Based National Detention Standards (PBNDS), which establish the minimum standards for ICE contractors on health, safety, and other matters.

6.  An integral part of Law Lab's work is documenting the human rights abuses suffered by individuals detained in ICE custody and advocating for oversight, accountability, and ultimately an end to all immigration detention. ICE has a well-documented history of failing to ensure safe and humane treatment of individuals in its custody, which has resulted in extensive human rights abuses, due process violations, and irreparable harm for detained individuals.

7.  Law Lab has undertaken extensive research and reporting on these issues at various detention facilities. For example, in January 2021, Law Lab co-authored a report documenting how ICE's El Paso field office – whose area of responsibility includes TCDF –

arbitrarily denies and refuses to timely adjudicate parole requests at the Otero County Processing Center in Chaparral, New Mexico.

8. Law Lab has also documented its concerns about conditions specifically at TCDF. Individuals detained by ICE are in civil detention, which according to the law is not intended to be punitive. However, in Law Lab's experience, TCDF functions as a site of punishment and deterrence. In November 2021, Law Lab co-authored a report to the DHS Office of Civil Rights and Civil Liberties on the dangerous conditions suffered by Haitians detained at TCDF, including medical neglect, inedible food, and contaminated drinking water. The complaint also documented extensive violations of the PBNDS requirements regarding access to counsel at TCDF.

9. Law Lab's concerns about conditions at TCDF have been recently echoed by the DHS Office of the Inspector General (OIG). DHS OIG occasionally inspects ICE detention facilities and has raised concerns about ICE's failure to ensure safe and humane treatment of individuals in its custody. ICE typically concurs with DHS OIG recommendations.

10. On March 18, 2022, DHS OIG publicly issued a "management alert" about TCDF, citing an ongoing investigation by DHS OIG and the DHS OIG findings from an unannounced in-person inspection of TCDF in February 2022. In the alert, DHS OIG reported that critical staffing shortages at TCDF had led to safety risks and unsanitary living conditions, including non-functioning moldy sinks, clogged toilets full of human waste, mold, water leaks, hot water issues, and issues with access to drinking water. As a result of the severity of its findings, DHS OIG recommended that ICE immediately relocate all detained individuals from TCDF and that ICE place no additional individuals in detention at TCDF unless and until the facility ensures adequate staffing and appropriate living conditions.

11. It is extremely rare for DHS OIG to issue an alert of this nature, particularly in the midst of an ongoing investigation. It is also Law Lab's understanding that the March 2022 alert was the first time that DHS OIG has called for the immediate removal of people in ICE custody from a detention facility.

12. Despite the clear indictment and directive of the DHS OIG alert, ICE disputed the findings of the report and continued to detain people at TCDF. However, Law Lab observed that ICE did appear to temporarily pause transfers of people into TCDF from March 18, 2022, until approximately April 15, 2022.

13. In late March 2022, the Nakamoto Group inspected TCDF as part of its contract with ICE to periodically assess detention facilities' compliance with the 2011 PBNDS. It is well documented, both by DHS OIG and legal advocates like Law Lab, that the Nakamoto Group's inspection practices are not consistently thorough and their inspections do not fully examine actual conditions and identify all deficiencies. In contrast to the DHS OIG report, issued the same month, the Nakamoto Group concluded that TCDF met all applicable standards despite understaffing remaining an unresolved issue.

14. After the Nakamoto Group's report on TCDF was posted publicly on ICE's website, ICE promptly recommenced transfers of individuals into TCDF, bringing in more than one hundred people in less than a week. Law Lab has observed that transfers into TCDF have continued on a regular basis since that time.

15. It is Law Lab's understanding that the DHS OIG investigation into TCDF is ongoing at this time. ICE has not communicated to the public any concrete steps that the agency is taking to ensure the health and safety of individuals in its custody at TCDF. ICE has also not

explained publicly why the agency has refused to depopulate TCDF and instead resumed transfers into the facility, in direct contradiction of the DHS OIG recommendations.

16.  Law Lab currently continues to provide pro bono legal services to individuals detained in ICE custody at TCDF and to document health and safety issues at TCDF. Since the March 2022 alert, Law Lab has continued to observe and document issues such as poor living conditions, medical neglect, due process violations, mistreatment by staff, and access to counsel violations. Given the remote location of TCDF, legal phone calls are the main means of access to counsel for most detained individuals; in our experience, this telephonic legal access is inconsistent and often unavailable. Law Lab is also aware of the TCDF medical staff's failure to identify and alert ICE on patently obvious *Fraihat* conditions, such as asthma. One at least one occasion, staff failed to attend to a medical emergency for 24 hours.

17.  Law Lab also continues to advocate for the release of individuals who remain detained at TCDF, including by submitting requests for parole to ICE's El Paso field office. Both before and after the DHS OIG alert, many of these parole requests have been denied discretionarily by ICE without a reasoned justification.

18.  In Law Lab's experience, the dangerous conditions at TCDF are causing severe physical and psychological trauma to detained individuals, which hinders their ability to prepare asylum applications, requests for release, and other filings and testimony. By way of example, one client—who I was representing for a bond hearing—told me in March 2022 that he felt psychologically "destroyed" because of the conditions at TCDF. He shared with me that the cells and common areas are rarely cleaned and that the guards bring one bucket of tap water with ice in it per day for his entire housing unit; when it runs out he says they are thirsty the rest of the day. He mentioned that some days the guards don't take them outside at all, while other days

they get only thirty minutes or an hour outside. He said that he was suffering so much from the stress of being detained in these conditions that his hair was falling out.

19. ICE's defiance in the wake of the DHS OIG alert is further compromising detained individuals' right to legal representation, a vital element of which is access to counsel. Law Lab has had to, and continues to, expend valuable time and resources that would otherwise be spent evaluating potential clients at TCDF and preparing requests for release, instead discussing detained individuals' concerns regarding immediate health and safety issues at TCDF.

20. As a result of these developments, Law Lab filed a FOIA request through counsel to ICE on May 3, 2022, to obtain agency records relating to ICE's response to the DHS OIG inspection of TCDF and the March 18, 2022, DHS OIG alert calling for the immediate removal of all ICE detainees from TCDF. Law Lab filed the request to shed light on how ICE is addressing critical understaffing at TCDF, safety, and sanitation issues that pose an imminent threat to the life and physical safety of individuals detained in ICE custody at the facility. Law Lab seeks these records both to assist on-the-ground efforts to protect the health and safety of individuals detained in ICE custody at TCDF and to ensure inform real-time advocacy to hold ICE accountable for its response to the DHS OIG investigation. Law Lab requested expedited processing of its FOIA request and submitted a statement explaining in detail why expedited processing was warranted.

21. To date, ICE has neither granted nor denied Law Lab's request for expedited processing of Law Lab's FOIA request. ICE designated Law Lab's FOIA request as request no. 2022-ICFO-14041 and acknowledged receipt of request no. 2022-ICFO-14041 on May 3, 2022. However, ICE has not provided any determination letter regarding Law Lab's FOIA request.

Since May 3, 2022, ICE has not communicated at all with Law Lab regarding Law Lab's FOIA request nor has ICE produced any responsive records to Law Lab.

22. Law Lab's ability to obtain public records in a prompt manner is critical to ensuring Law Lab can effectively defend the rights of individuals detained at TCDF. As a result of ICE's inadequate response to the DHS OIG alert, we have observed that individuals currently detained at TCDF are exposed to mold, unsafe drinking water, and inoperable and malfunctioning toilets, sinks, and showers, among other sanitation issues. These individuals face the imminent risk of serious health problems resulting from such unsanitary conditions. The requested records will aid Law Lab in ensuring that its advocacy and pro bono legal services for individuals detained at TCDF encompass timely and meaningful information on how to exercise their rights and advice on how to address their immediate concerns about dangerous conditions at the facility, including how to raise concerns through grievances and other avenues. Responsive records may also demonstrate how ICE's inadequate response to the DHS OIG alert is interfering with individuals' due process rights or their ability to meaningfully exercise their right to seek asylum.

23. Expedited processing of Law Lab's FOIA request will also empower Law Lab to mobilize elected officials, policymakers, and other stakeholders to mitigate the conditions at TCDF and advocate for ICE to release individuals detained there. Law Lab's organizational purpose includes holding federal immigration agencies accountable through the pursuit of transparency, oversight, impact litigation, and public awareness-raising to influence policymaking in the United States. The records Law Lab seeks will provide important information to help ensure public accountability for ICE's inadequate response to the serious health and safety issues documented by DHS OIG at TCDF. Law Lab must be able to quickly

obtain records responsive to this FOIA request in order to engage in meaningful and effective advocacy in a fast-moving and fluid situation.

24. Responsive records, if obtained by Law Lab expeditiously, are likely to immediately influence public discourse on ICE's response to the ongoing DHS OIG investigation. Given that ICE has disputed the contents and accuracy of the DHS OIG alert, cast doubt on the objectivity of the DHS OIG inspectors, refused to depopulate the facility, and initiated new transfers into TCDF despite unresolved serious health and safety issues at the facility, there is a heightened concern shared by members of the public, elected officials, and the news media alike regarding ICE's acts and omissions since the issuance of the DHS OIG alert. Numerous news outlets have demonstrated substantial and persistent interest in the living conditions at TCDF and the treatment of individuals detained in ICE custody there. Reporters and policymakers alike have raised serious and legitimate questions as to ICE's integrity. The rapidly unfolding situation at TCDF has further called into question the agency's ability to ensure that minimum standards and contractual obligations are met. The requested records, if timely obtained, are thus likely to attract significant public attention and concern—particularly in light of the media coverage and Congressional outcry that ICE's dispute of the DHS OIG alert has already garnered—and will likely lead to additional scrutiny in the press and in the halls of Congress.

25. Law Lab has the capacity, intent, and demonstrated ability to effectively disseminate records responsive to this FOIA request to immigration attorneys, advocates, organizers, noncitizens, media, members of Congress and other interested members of the public free of charge. Law Lab disseminates information about immigration law and policy in numerous different media and forums for use in educating the public. In addition to Law Lab's

aforementioned reports on detention conditions and access to legal rights, which are disseminated to a wide public audience, Law Lab uses innovative social media strategies to inform the public about immigration law and policy. Law Lab publishes periodic e-newsletters, long- and short-form videos, and other content systems to widely share information and analysis. Law Lab's website, innovationlawlab.org, is intended to share information and educate the public. This website is visited by many members of the public, elected officials, and individuals impacted by immigration law and policy. Law Lab regularly issues press statements and other media alerts to an extensive list of local, regional, and national media outlets. Law Lab maintains regular contact with a broad set of reporters who cover immigration law and policy. Additionally, Law Lab will share the requested records with over a dozen legal service provider listservs with a reach of thousands of subscribers nationwide.

26.    Law Lab will be irreparably harmed if records responsive to its FOIA request are not produced on an expedited basis. Without a timely response regarding the rapidly evolving situation at TCDF, Law Lab will be unable to achieve its mission of effectively providing legal services to protect the rights of detained clients. Delay will also impede timely advocacy by Law Lab aimed at impacting ICE's response to the health and safety issues documented in the ongoing DHS OIG investigation of TCDF. For Law Lab to effectively urge policymakers, members of the press, and the public to take action, the organization must have access to timely information. If ICE further delays the release of responsive records, Law Lab will be obstructed in its mission of seeking to hold ICE accountable for detaining individuals in life-threatening, punitive conditions at TCDF.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

    EXECUTED this 12th day of June, 2022 in San Diego, CA.

                                            _____
                                            Ian Philabaum
                                            Co-Director, Anticarceral Legal Organizing
                                            INNOVATION LAW LAB
                                            333 SW 5th Ave Suite 200
                                            Portland, OR 97204
                                            T: (619) 930-9791
                                            ian@innovationlawlab.org